Leon CAIN, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 84 Civ. 9278 (RWS).

United States District Court,
S.D. New York.

July 25, 1986.

Schneider, Kleinick, Weitz, P.C., New York City, for plaintiff; Gregory J. Cannata, of counsel.

Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., New York City, for defendant; Frederick M. Lawrence, Asst. U.S. Atty., of counsel.

SWEET, District Judge.

Plaintiff Leon Cain ("Cain") filed this action on December 26, 1984 alleging that the federal government and the State of New York violated his constitutional and civil rights by subjecting him to medical experimentation while incarcerated in New York State. Defendant United States of America (the "government") has moved for an order dismissing this action pursuant to Rule 12(c) Fed.R.Civ.P. for lack of subject matter jurisdiction or alternatively pursuant to Rule 56 for summary judgment on the grounds that the action is time-barred. For the reasons set forth below, the motion is denied.

Facts

From 1952 to 1955 Cain was incarcerated in Sing Sing Prison ("Sing Sing") in Ossining, New York, and was the subject of a syphilis experiment at the prison. The experiment was conducted by the New York State Health Department under the auspices of the United States Public Health Service, and consisted of the purposeful infection of subjects with treponema pallidum or syphilis spirochete bacteria, and subsequent treatment, in Cain's case with penicillin injections. The parties vigorously dispute the nature of this participation. Cain contends that he never consented to participate as a subject but merely consented to receive penicillin injections as treatment for the congenital syphilis with which

he was infected when he entered Sing Sing in 1952.

In 1957 Cain was under the care of Dr. David Marcus for his syphilitic condition, and told Dr. Marcus that he might have been involved in a syphilis experiment while at Sing Sing. When Dr. Marcus contacted the Department of Correction of the State of New York, he received a letter from Dr. A.L. Cimildora, dated April 23, 1963, denying the existence of a syphilis experiment and denying Cain's participation in such a study. The letter stated in relevant part: "Nowhere in any of his medical records pertaining to Sing Sing or any other institution in the Department of Correction is there any reference that he participated as a volunteer in any type of experiment where he received injections of spirachital matter or any other injections of any type." The letter stated that he had a positive serological titer (or measurement of the concentration of syphilis antibodies in solution) of 18 when he entered Sing Sing in 1952, that it rose to 170 in 1953 and declined to 30 when he was transferred to Auburn Prison in Auburn, New York, and that his titer level at discharge from prison on March 14, 1957 was 45.

In 1976, Cain wrote to the office of then Governor Hugh Carey concerning the Sing Sing experiments, and received a response from the New York State Commissioner of Health, Robert P. Whalen, who answered that Cain had been a subject in a syphilis experiment at Sing Sing. The portion of the letter relevant to the government's statute of limitations defense provides:

As I am sure you are aware, you were a voluntary participant in an experiment study conducted while you were a prisoner in a New York State correction institution. The study involved the purposeful infection with treponema pallidum and subsequent adequate treatment. I have been informed that this study was performed under the supervision of Doctor Thomas under the authority of the United States Public Health service.

In response to this information that a federal agency supervised the study, Cain went to the Public Health Service of the United States Department of Health, Education and Welfare in Manhattan and asked to receive treatment at the Public Health Service hospital on Staten Island. According to Cain, he spoke with Mr. Scott who advised him that the federal government had nothing to do with syphilis experiments, and that he could not be treated at Staten Island Hospital. This information was summarized in a letter from Dr. Nicholas J. Galluzzi, the Regional Health Administrator for the Public Health Service to Cain on January 26, 1976:

I have spoken with Mr. Scott regarding your particular situation. I can only reiterate what you have already been told. The U.S. Public Health Service Regional Office has no direct jurisdiction over the hospital on Staten Island nor any other health facility which could offer you the service you request.

.     .     .     .     .

Although I understand that you have explored most avenues, I suggest that you recontact the New York State Department of Health since the alleged incident occurred within a state institution.

Dr. Galluzzi also explained that the federal hospital on Staten Island was authorized to deliver services only to statutory beneficiaries such as members of uniformed services and federal employees.

Cain took no further action with respect to his claims until the fall of 1981, when he watched a television program which described a syphilis experiment conducted in Tuskegee, Alabama with the participation of the Public Health Service. Prompted by this program, Cain again visited the Public Health Service office in Manhattan and brought along the letter which he had received on January 23, 1976 from Robert Whalen stating that the United States Public Health Service had conducted these experiments at Sing Sing as proof of federal involvement.

Cain wrote to Assistant Secretary Edward Brandt of the Department of Health and Human Services at approximately the same time, and also enclosed Robert Whal-

en's letter and the 1963 letter from Auburn Prison denying the government's role in the experiment. Cain's handwritten letter sets out his belief that he was one of the "human guinea pigs" in a syphilis experiment at Sing Sing, and requests information on compensation available to him.

Cain received a response dated December 11, 1981 from Dr. William H. Foege of the Centers for Disease Control in Atlanta, who stated that Cain's records indicate that he had been a "voluntary participant" in a syphilis experiment at Sing Sing, concluded that there is no connection between his current medical problems and the experiment, and advised Cain that he could pursue the matter under the Federal Tort Claims Act at an address provided. On January 12, 1982, Cain wrote to Dr. Foege requesting copies of the records to which Dr. Foege referred in his letter of December 11, 1981. The records provided were (1) a sample release form used in the study; (2) the study publication entitled "Inoculation Syphilis in Human Volunteers"; (3) a case history summary, and (4) study participant record. The government could not produce a consent form signed by Cain. On February 5, 1982 Dr. Foege, in response to a letter from the New York Regional Office of Health and Human Services concerning Cain's request that the government substantiate its claim that his participation was voluntary, referred Cain to a portion of the study publication entitled "selection of patients" and the copy of the standard release form. The relevant portion of the study described these methods:

> Prisoners confined at Sing Sing are all males, 21 years of age or older. They come primarily from urban centers in lower New York State, a factor of importance for two reasons. First, the only promise of reward that could be made to any of the volunteers was that they would not be transferred from the Sing Sing Prison until the study had been completed. Because Sing Sing is one of the more desireable prisons in the New York prison system, and because remaining there would permit more frequent

visitation by relatives and friends, this promise proved a potent one in soliciting volunteers. The second factor of importance was that a large number of the men had their original syphilis treated in urban centers where the records could be documented, and in many instances had been treated by one of the authors of the present study.

*Id.* at p. 43–44.

In contrast, the standard release form provided:

> I so volunteer myself as a subject for the said studies and experiments and so release the State of New York ... without promise of privilege, profit or remuneration to myself and without promise of release, parole or reduction in the time of my sentence in any State prison or reformatory, but do so for the sole reason that the result of the studies and experiments upon my person may be a step toward possible protection to persons in the future against the effects of syphilis and possible similar diseases.

On October 7, 1983, Cain filed his administrative tort claim with the Public Health Service which was denied on June 26, 1984. The Department of Health and Human Services concluded that Cain had knowledge of sufficient information to file his tort claim by 1976 and was, therefore, barred by the statute of limitations contained in 28 U.S.C. § 2401(b).

**Discussion**

The government premises its Rule 12(c) motion on the statute of limitations governing actions brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–80 ("FTCA"). Section 2401(b) contains a two-year statute of limitations:

> (b) A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered

mail, of notice of final denial of the claim by the agency to which it was presented. 28 U.S.C. § 2401(b).

■ The two-year limitation period thus runs from the date on which the claim accrues, not necessarily on the date of the allegedly tortious act. The determination of this accrual date is governed by federal law. *Toal v. United States*, 438 F.2d 222, 224 n. 3 (2d Cir.1971); *Kossick v. United States*, 330 F.2d 933, 935 (2d Cir.1964) (Friendly, J.). In this regard, the government contends that Cain's claim accrued at the very latest date on January 23, 1976, the date of Commissioner Whalen's letter to Cain which informed him that the Sing Sing experiments were conducted under the auspices of the United States Public Health Service, almost seven years before Cain filed his administrative claim on October 7, 1983.

The Supreme Court has set out the factors to be evaluated in the determination of when a claim accrues for purposes of the FTCA. In *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) the Court reversed a determination by the Third Circuit Court of Appeals that a medical malpractice claim did not accrue until the plaintiff "knew or could reasonably be expected to know that in the eyes of the law [his medical] treatment constituted medical malpractice." *Id.* at 118, 100 S.Ct. at 357. Endorsing a narrow construction of § 2401(b) in deference to congressional intent to execute only a limited waiver of sovereign immunity and the policy of encouraging prompt presentation of claims, the Court held that a FTCA claim accrues when the claimant knows of both the existence and the cause of his injuries, and not when the plaintiff knows that his injury was negligently inflicted:

We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of its injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about cau-

sation may be in control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask. If he does ask and if the defendant has failed to live up to minimum standards of medical proficiency, the odds are that a competent doctor will so inform the plaintiff.

*Kubrick*, 444 U.S. at 122, 100 S.Ct. at 359.

According to the government, Cain was aware of the fact of his injury in the 1950's during the syphilis experiment, and at the very latest was aware of who had inflicted the injury—namely the federal government through the United States Public Health Service—upon receipt of Commissioner Whalen's letter of January 23, 1976. Cain contends, however, that far from admitting its role in the experiments, the federal health authorities gave him a "bureaucratic run around" to induce him to drop his claims, and fraudulently concealed critical information about the experiment and observed the federal role in the study.

Cain seeks to invoke the "diligence discovery" standard of accrual in FTCA actions recently discussed by the Second Circuit in *Barrett v. United States*, 689 F.2d 324 (2d Cir.1982), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983). In *Barrett* the court, holding that genuine issues of material fact precluded summary judgment on the statute of limitations bar, concluded that the diligence-discovery standard of accrual was warranted because the plaintiff had produced evidence that the government had intentionally concealed material facts relating to the army's responsibility for negligence in the administering of a chemical warfare experiment. The Second Circuit cited *United States v. Kubrick, supra,* 444 U.S. 111, 100 S.Ct. 352, for the proposition that accrual may be postponed until the plaintiff has or with reasonable diligence should have dis-

covered the critical facts of both his injury and its cause. In *Barrett* the plaintiff, daughter of a deceased subject of an army chemical warfare experiment, alleged that the government had engaged in a conspiracy to cover up facts of her father's death after being injected with a mescaline derivative while unknowingly serving as a test subject. Discussing the plaintiff's entitlement to the application of the diligence-discovery standard to toll the limitations period, the court observed:

> Not only was the "what" element of the causation inquiry arguably unknown to the plaintiffs until 1975, but the "who" element was also missing from the puzzle ... Cases which have held that the identity of the Government as a potential defendant need not be known to a plaintiff in order for his FTCA cause of action to accrue involved situations where the "who" element was not actively being concealed. In those cases diligent discovery would have revealed the Government's role ...

> . . . . .

> It is illogical to require a party to sue the Government for negligence at a time when the government's responsibility in the matter is suppressed in a manner designed to prevent the party, even with reasonable effort, from finding out about it.

*Barrett v. United States, supra,* 689 F.2d at 330; *see also Peck v. United States,* 470 F.Supp. 1003, 1018 (S.D.N.Y.1979) ("We find that this [due diligence-discovery] rule as to when the cause of action accrues is applicable under § 2401(b) only where the United States has concealed its acts with the result that plaintiff was unaware of their existence.")

Cain also asserts that the federal government's bureaucratic denials and evasions prevented him from obtaining information underlying crucial elements of his claims. In *Hohri v. United States,* 782 F.2d 227 (D.C.Cir.1986), *reh. denied,* 793 F.2d 304 (1986) (Skelly Wright, J.) the District of Columbia Circuit Court held, *inter alia,* that the government's fraudulent conceal-

ment will toll the statute of limitations if the facts concealed prevent the plaintiff from alleging a crucial element of his claim, and not merely concealment of the fact of injury and the identity of the inflictor. *Id.* at 249. Noting the Second Circuit's refusal in *United States v. Barrett, supra,* 689 F.2d at 328–330 to extend the *Kubrick* rationale to cover cases in which the plaintiff has alleged fraudulent concealment on the part of the government, the court explained:

> Appellee argues that the "facts giving notice of the particular cause of action at issue" include only the fact of injury and the identity of the inflictor ... We do not agree. As already noted, in assessing the import of fraudulent concealment we are first and foremost concerned with its *legal effect.* Once a defendant has effectively closed the courthouse door to all plaintiffs it is of little significance that that defendant has not also concealed his identity or the fact of injury.

> . . . . .

> Thus, where a defendant concealed information that prevented a plaintiff from alleging a crucial element of his claim, the statute would be tolled.

*United States v. Hohri, supra,* 782 F.2d at 249 (footnotes omitted) (emphasis in original).

The District of Columbia Circuit Court's opinion in *Richards v. Mileski,* 662 F.2d 65 (D.C.Cir.1981) relied upon by the *Hohri* court, also employed a "crucial element" standard for application of the tolling doctrine. In *Richards,* a career employee with the United States information agency resigned under duress in 1955 when he was falsely charged with homosexual activity. While he knew that the charges were false at the time, Richards was unaware that the agents who forced his resignation had done so with knowledge that the charges were false. The court tolled the statute of limitations for Richard's tort claim until the date on which he received FOIA documents which revealed a conspiracy to fabricate the charges, as the government had con-

.. 

**180**

cealed "the facts giving rise to plaintiff's claims." *Id.* at 63.

■ A review of the facts of this action in the context of these standards for the tolling of FTCA statutes of limitation demonstrates that the resolution of the time bar issue turns on unresolved factual issues and must be submitted to the finder of fact for resolution.

The government asserts that the letter from the New York State Commissioner of Health in 1976 constituted full notice of the federal government's involvement in the study ("I have been informed that this study was performed under the supervision of Doctor Thomas under the authority of the United States Public Health Service"). Cain was thus aware that the injury occurred and that the federal government was an "inflictor" of the injury within the meaning of *United States v. Kubrick, supra.*

Cain asserts, however, that the facts surrounding his efforts to obtain information from federal officials concerning the syphilis experiments demonstrate that the federal government concealed its participation in the experiment in a manner which tolled the limitations period in *Barrett, supra,* and prevented him from making a FOIA request which unearthed the "crucial elements" of his claims within the meaning of *Hohri, supra.* It is undisputed that in 1963 when Cain was under Dr. Marcus' care, the Department of Correction, Dr. A.L. Cimildora denied both the existence of the experiments and the federal role in their execution, depriving Dr. Marcus of information relevant to Cain's treatment. While the Whalen letter on January 23, 1976 squarely sets forth the federal government's participation, Cain contends that this letter from a state health commissioner was undercut by subsequent denials and obfuscations by federal officials which dissuaded him from pursuing the federal government for more information.

According to Cain, when he sought to obtain confirmation of the State Commissioners information from a federal authority, a "Mr. Scott" at the Public Health Service of the Department of Health, Education and Welfare told him once again that the federal government had nothing to do with syphilis experiments. The only memorialization of this conversation is the letter from Dr. Galluzzi, which refers to but does not incorporate Cain's conversation with Mr. Scott. Dr. Galluzzi confirmed Scott's advice and concluded, "Although I understood that you have explored most avenues, *I suggest that you recontact the New York State Department of Health since the alleged incident occurred within a State institution.*" (emphasis added)

Cain contends that Mr. Scott's statements denying federal involvement and denying him treatment in the federal hospital on Staten Island, combined with Dr. Galluzzi's letter referring him back to the state for information on the "alleged incident" offset the notice provided in the Whalen letter and tolled the statute of limitations on his claim. Cain has not provided an affidavit account of the Scott conversation, and similarly the government has not obtained affidavits from Mr. Scott or Dr. Galluzzi, who received a third-hand account of the conversation.

If the conversation consisted of Mr. Scott's denial of federal involvement and not merely the denial of treatment in the Staten Island facility, and if Dr. Galluzzi's letter was a reiteration of this denial, a fact finder might reasonably conclude that in 1976 the Public Health Service had fraudulently concealed its involvement in the experiments. These facts would distinguish the case at bar from the Supreme Court's concerns in *Kubrick, supra,* where the court found that Kubrick had all the facts of his injury and its inflictor before the statute of limitations had run on his claim, but neglected to obtain medical advice on whether the treatment he had received was within the proper standard of medical care:

> ... Kubrick need only have made inquiry among doctors with average training and experience in such matters to have discovered that he probably had a good cause of action. The difficulty is that it does not appear that Kubrick ever made any inquiry, although meanwhile he had

consulted several specialists about his loss of hearing and had been in possession of all the facts about the cause of his injury since January 1969 ...

.　　.　　.　　.　　.

We thus cannot hold that Congress intended that "accrual" of a claim must await awareness by the plaintiff that his injury was negligently inflicted. A plaintiff such as Kubrick, armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community. To excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims against the government.

*United States v. Kubrick, supra,* 444 U.S. at 123, 100 S.Ct. 360 (footnote omitted).

Similarly, if the fact finder determines that the conversation with Mr. Scott and the Galluzzi letter prompted Cain to abandon his search for information concerning the syphilis experiment, Cain should not be prejudiced for delaying his FOIA request until 1981 when Dr. Foege unambiguously admitted the federal government's responsibility for the experiment and the existence of medical records for the study.

The information provided by Dr. Foege and Dr. Brandt in response to Cain's Freedom of Information Act ("FOIA") request, namely the release of the final study publication, the test results specific to Cain, the standard release form (and the absence of a release form for Cain's participation) and the records of follow-up treatment procedures provided the essential elements for Cain's negligence and 42 U.S.C. § 1983 claims. Specifically, the FOIA information provide the basis for Cain's allegations that (1) the prison authorities never obtained his consent to be a subject in the study; (2) the consent form used was in any event inadequate; (3) he received massive doses of syphilis bacteria and did not receive follow-up treatment, and (4) Dr. Cilmildora misrepresented the serological titer levels of Cain's exposure in his letter to Cain's physician in 1963.

If the fact finder concluded that Cain's failure to make this FOIA request in response to Commissioner Whalen's letter of January 23, 1976 was caused by the federal government's subsequent concealment of its participation, the statute of limitations on Cain's claims would be tolled, as these "crucial elements" of his claim would have been obscured by an obstacle course of partial truths. Although the *Hohri* court carefully limited this "crucial element" notion of when to toll the statute of limitations in the context of fraudulent concealment to prevent its application to concealment of "all facts material to *any* legal issue of significance in a case," *Hohri v. United States, supra,* 782 F.2d at 249 n. 57, the facts which may have been concealed from Cain go to the very essence of his claims against the Public Health Service and may warrant the tolling of the limitations period in 28 U.S.C. § 2401(b).

Because there remains a substantial disputed issue of material fact as to the federal government's concealment of its role in the syphilis experiments, the government's motion for summary dismissal is denied. Discovery will be completed by October 22 and the pretrial order filed October 29, 1986.

IT IS SO ORDERED.